# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| WILFREDA WALLER, *individually and on behalf of all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> BRIDGE IT, INC. *d/b/a* BRIGIT, <br><br> Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Wilfreda Waller ("Plaintiff"), on behalf of herself and the proposed "Class" (defined below), respectfully files this Class Action Complaint against Defendant Bridge It, Inc. d/b/a Brigit ("Brigit" or "Defendant") and states as follows. Plaintiff bases the allegations below on personal knowledge as to matters related to, and known to, her. As to all other matters, Plaintiff bases her allegations on information and belief, through investigation of her counsel.

## NATURE OF THE ACTION

1. This is an action brought by Plaintiff Wilfreda Waller, individually and on behalf of all others similarly situated, due to Brigit's charging of

Plaintiff and other consumers without their knowledge or permission and illegal "automatic renewal" tactics.

2.    Brigit operates a personal finance mobile application ("app") that promises consumers who live paycheck to paycheck short-term cash advances if they enroll in a monthly membership plan.

3.    Brigit debits the monthly membership fee directly from consumers' bank or credit union accounts and automatically renews the plan until consumers cancel.

4.    As discussed further below, Brigit charged Plaintiff's credit union account in December 2024 and January 2025. Four of the charges caused Plaintiff to incur insufficient funds fees of $35.00 per charge from her credit union, and subsequently Plaintiff's credit union closed her account, which caused her significant hardship.

5.    As Plaintiff's experience shows, Brigit's conduct puts those who are already financially vulnerable in more financial jeopardy.

6.    Brigit preys upon those who need cash advances, making them even more susceptible to financial harm, loss of income, overdraft charges, and other losses.

7.    In November of 2023, the FTC brought a complaint against Brigit for making deceptive representations about its cash advances and preventing consumers from cancelling their Brigit subscriptions, which automatically

2

renew every month.[1]

8.      One year later in November of 2024, Brigit agreed to "pay $18 million in consumer refunds, stop its deceptive marketing promises, and end tactics that prevented customers from cancelling."[2]

9.      However, Brigit has continued to harm consumers, including Plaintiff and the Class members.

10.     This action seeks to hold Brigit accountable for its unfair, deceptive, and illegal actions. As set forth below, on behalf of a nationwide Class, Plaintiff brings claims for conversion under New York and Georgia law[3]; violation of New York General Business Law ("GBL") section 349[4]; the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq.* ("EFTA"), and its implementing regulations; and unjust enrichment under New York law.

---

[1] Complaint for Permanent Injunction, Monetary Judgment, and Other Relief, *FTC v. Bridge It, Inc.*, No. 1:23-cv-09651 (S.D.N.Y. Nov. 2, 2023), ECF No. 1, *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/2223051brigit complaint.pdf [https://perma.cc/5QMQ-DCQG].

[2] *See Bridge It, Inc., FTC v. (Brigit)*, WWW.FTC.GOV (Nov. 4, 2024), https://www.ftc.gov/legal-library/browse/cases-proceedings/2223051-bridge-it-inc-ftc-v-brigit [https://perma.cc/PM44-ZKVT].

[3] In the alternative to her conversion claim under New York law, on behalf of a "Georgia Subclass" (defined below), Plaintiff brings a conversion claim under Georgia law.

[4] In the alternative to her claim under New York GBL section 349, on behalf of the Georgia Subclass, Plaintiff brings a claim for violation of Georgia's Fair Business Practices Act of 1975, GA. CODE § 10-1-390 *et seq.* ("GFBPA").

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, under 28 U.S.C. § 1332(d). Because Plaintiff is a citizen of South Carolina and Defendant is a citizen of New York and Delaware, at least one member of the plaintiff class is a citizen of a state different from Defendant. Further, Plaintiff alleges the matter in controversy is well in excess of $5,000,000 in the aggregate, exclusive of interest and costs. Finally, Plaintiff alleges "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100. *See* 28 U.S.C. § 1332(d)(5)(B).

12.    This Court has personal jurisdiction over Defendant because a substantial part of the events or omissions giving rise to the claim occurred in Georgia, including Defendant's conduct of repeatedly charging Plaintiff's credit union account at Georgia United Credit Union based in Gwinnett County, Georgia, without her knowledge or consent, while she was living in Gwinnett County, Georgia.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District, including Defendant's conduct of repeatedly charging Plaintiff's credit union account at Georgia United Credit Union based in Gwinnett County, Georgia, without her knowledge or consent, while she was

living in Gwinnett County, Georgia.

## PARTIES

14.    Plaintiff Wilfreda Waller is a citizen and resident of Conway, South Carolina, in Horry County.

15.    Defendant Bridge It, Inc. d/b/a Brigit is a corporation organized under the laws of the state of Delaware. Defendant's principal place of business is located at 36 West 20th Street, Floor 11, New York, New York 10011, in New York County.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.    The Subscription e-Commerce Industry

16.    The e-commerce subscription model is a business model in which companies provide ongoing goods or services "in exchange for regular payments from the customer."[5]

17.    The production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity in recent years. Indeed, "[t]he Subscription Economy® [grew] more than 400% over the . . . 8.5 years" prior to 2020, as consumers "demonstrate[d] a growing

---

[5] *See* Sam Saltis, *Best Ecommerce Subscription Platforms: What's Changing*, CORE DNA (Sept. 19, 2021), https://www.coredna.com/blogs/ecommerce-subscription-services [https://perma.cc/7TF8-LRLH].

preference for access to subscription services over the ownership of products."[6] And over 11 years prior to March 2023, "subscription-based companies . . . [grew] 3.7x faster than the companies in the S&P 500."[7]

18.    According to the Washington Post, analysts at UBS predicted in 2021 that the subscription economy would expand into a $1.5 trillion market in 2025, up from an estimated $650 billion in 2021.[8]

19.    However, there are well-documented downsides associated with the subscription-based business model. While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market.

20.    In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[9] For example, in the meal-kit category, there are

---

[6] Jayne Gonzalez, *Subscription Businesses Outpace S&P 500 Revenues Nearly 6X Amid Pandemic, Marking Pivotal Turning Point Across Industries*, ZUORA (Sept. 23, 2020), https://www.zuora.com/press-release/subscription-businesses-outpace-sp-500-revenues-nearly-6x-amid-pandemic-marking-pivotal-turning-point-across-industries/ [https://perma.cc/RP9R-BQHE].

[7] *The Subscription Economy Index* 4, ZUORA (Mar. 2023), *available at* https://www.zuora.com/wp-content/uploads/2023/03/Zuora_SEI_2023_Q2.pdf [https://perma.cc/FL6N-EYZ8].

[8] Heather Long & Andrew Van Dam, *Everything's becoming a subscription, and the pandemic is partly to blame*, WASHINGTON POST (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ [https://perma.cc/GFV4-Y8UA].

[9] Tony Chen et al., *Thinking inside the subscription box: New research on e-*

"particularly high rates of cancellation within the first six months (60 to 70 percent and higher), probably reflecting highly competitive prices and broad similarities among the leading players."[10]

22. Yet, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[11]

22. As explained in the Washington Post, "[t]he real money is in the inertia."[12] As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[13] That is, to facilitate consumer inertia, some subscription e-commerce companies, including Defendant, "are now taking advantage of subscriptions in order to trick users into signing up

---

*commerce consumers*, MCKINSEY & CO. (Feb. 9, 2018), https://www.mckinsey .com/industries/technology-media-and-telecommunications/our-insights/ thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers [https://perma.cc/5PBU-8NZN].

[10] *Id.*

[11] Amrita Jayakumar, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets*, WASHINGTON POST (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f681 35b6-a92b-11e3-8d62-419db477a0e6_story.html [https://perma.cc/K4FF-8SN6].

[12] *Id.*

[13] *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want*, BUSINESS INSIDER (June 25, 2019), https://www.businessinsider.com/dark-patterns-online-shopping-princeton-2019-6 [https://perma.cc/V4KJ-QUT2].

for expensive and recurring plans."[14] "They do this by intentionally confusing users with their app's design and flow, . . . and other misleading tactics,"[15] such as failure to fully disclose the terms of automatic-renewal programs.

23.    To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[16]

24.    Furthermore, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[17] Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts [and] attempting to respond to a proliferation of abuses by some companies over the past few years,"[18] widespread utilization of these misleading "dark

---

[14] Sarah Perez, *Sneaky subscriptions are plaguing the App Store*, TECHCRUNCH (Oct. 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store [https://perma.cc/F2TK-3754].
[15] *Id.*
[16] Richmeyer, *The problem with subscription marketing*, NEW MEDIA & MKTG. (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing [https://perma.cc/E2MY-496M]; *see also* Heather Long & Andrew Van Dam, *supra* note 9 ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'").
[17] Heather Long & Andrew Van Dam, *supra* note 9.
[18] *Id.*

patterns" and deliberate omissions persists.

25.     Brigit uses design tricks, like those referred to in a 2022 staff report by the Federal Trade Commission ("FTC") Bureau of Consumer Protection as "dark patterns."[19]

26.     The term "dark patterns" used herein is a term of art from the field of user experience ("UX"). The International Organization for Standardization (ISO) defines "user experience" as a "person's perceptions and responses that result from the use or anticipated use of a product, system or service."[20]

27.     Dark patterns in UX are the implementation of tricks to lure "users into choosing paths that they didn't probably want to take, thus fulfilling the business objectives, completely ignoring the requirements and ethics of users."[21]

28.     The term "dark patterns" was borrowed from existing UX

---

[19] *See* FTC BUREAU OF CONSUMER PROT., *Bringing Dark Patterns to Light* 2 (2022), *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/P214800+ Dark+Patterns+Report+9.14.2022+-+FINAL.pdf [https://perma.cc/8WBW-QXQL] ("Coined in 2010 by user design specialist Harry Brignull, the term 'dark patterns' has been used to describe design practices that trick or manipulate users into making choices they would not otherwise have made and that may cause harm. . . . [D]ark patterns often take advantage of consumers' cognitive biases to steer their conduct or delay access to information needed to make fully informed decisions." (footnote omitted)).

[20] Will T, *User Experience (UX): Process and Methodology*, UIUX TREND (2025), https://uiuxtrend.com/user-experience-ux-process/.

[21] Joey Ricard, *UX Dark Patterns: The Dark Side Of The UX Design*, KLIZO SOLS. PVT. LTD. (Nov. 9, 2020), https://klizos.com/ux-dark-patterns-the-dark-side-of-the-ux-design [https://perma.cc/ SSL8-T7PC].

terminology. The term "dark patterns" was intended to "communicate the unscrupulous nature" of the design "and also the fact that it can be shadowy and hard to pin down."[22]

29.    The below image provides some examples of commonly employed dark patterns[23]:

---

[22] Harry Brignull, *Bringing Dark Patterns to Light*, MEDIUM (June 6, 2021), https://harrybr.medium.com/bringing-dark-patterns-to-light-d86f24224ebf (transcript of speech Mr. Brignull gave at FTC's dark patterns workshop on April 29, 2021).

[23] Sarbasish Basu, *What is a dark pattern? How it benefits businesses- Some examples*, H2S MEDIA (Dec. 19, 2019), https://www.how2shout.com/technology/what-is-a-dark-pattern-how-it-benefit-businesses-with-some-examples.html [https://perma.cc/QAU4-XG6X].



30.    Dark patterns are highly effective.[24] As the FTC has explained:

> one study discussed at the [FTC's public workshop on digital dark patterns held on April 29, 2021] found that dark patterns doubled the percentage of consumers who signed up for a dubious identity theft protection service, as compared to consumers who were presented with a neutral interface. And these effects increased significantly when test subjects were exposed to more than one dark pattern.[25]

31.    Unscrupulous UX designers have subverted the intent of the researchers who discovered cognitive biases by using these principles in ways

---

[24] FTC BUREAU OF CONSUMER PROT., *supra* note 1, at 1-2.
[25] *Id.* at 2.

that undermine consumers' autonomy and informed choice, and they used A/B testing to turn behavioral insights into strikingly "effective" user interfaces that deceive consumers in ways that are profitable to the company applying them.[26]

32.    Brigit has engaged in just such dark patterns and unlawful subscription practices with great success, which was the subject of the 2023 action and 2024 settlement with the FTC.

33.    In 2024, Brigit was acquired by Upbound Group, Inc., for the total consideration of $460 million.[27]

34.    Brigit is estimated to generate revenues of approximately $215 million to $230 million in 2025 and approximately $350 million to $400 million in 2026,[28] in at least part due to implementation of dark patterns and unlawful practices.

---

[26] Arvind Narayanan et al., *Dark Patterns: Past, Present, and Future: The evolution of tricky user interfaces*, 18(2) ACM QUEUE 67-91 (2020), https://queue.acm.org/detail.cfm?id=3400901, https://spawn-queue.acm.org/doi/pdf/10.1145/3400899.3400901.

[27] *Upbound Group Enters Definitive Agreement to Acquire Brigit, a Leading Financial Health Technology Firm, for up to $460 Million*, UPBOUND (Dec. 12, 2024), https://investor.upbound.com/news-releases/news-release-details/upbound-group-enters-definitive-agreement-acquire-brigit-leading [https://perma.cc/MHF9-KF94].

[28] *Id.*

## II.    Brigit's Unlawful and Predatory Acts and Practices

35.    Brigit operates a personal finance mobile app over the Internet that can be downloaded through mobile app stores such as the Apple App Store and Google Play or via app store links on Brigit's website.

36.    Brigit markets its app to consumers who are living paycheck to paycheck, through advertisements on social media, television, and YouTube, and on its website, www.hellobrigit.com.

37.    Brigit advertises its app as a tool that provides alerts and offers short-term cash advances when a consumer's bank or credit union account balance is running low so consumers can avoid paying overdraft fees.

38.    Cash advance apps such as Brigit's target low- and moderate-wage workers who are already living paycheck to paycheck.[29] Research shows that from 59% to 97% of consumers using four different cash advance companies earned less than $50,000 per year.[30]

39.    Brigit has three membership plans: free, "Plus," and "Premium."[31]

---

[29] Christelle Bamona & Lucia Constantine, CTR. FOR RESPONSIBLE LENDING, *Escalating Debt: The Real Impact of Payday Loan Apps Sold as Earned Wage Advances (EWA)* 5 (Sept. 2025), *available at* https://www.responsible lending.org/sites/default/files/nodes/files/research-publication/crl-payday-loan-apps-ewa-sep2025.pdf [https://perma.cc/F429-5EMC]; *see also* WWW.FTC.GOV, *supra* note 3.
[30] Lucia Constantine et al., *supra* note 31, at 3.
[31] *How much does Brigit cost?*, BRIGIT.COM (2025), https://help.hellobrigit.com/hc/en-us/articles/360034832191-How-much-does-Brigit-cost.

40.    Brigit's free membership includes alerts for low account balances but does not include cash advances.[32]

41.    Brigit's Plus membership costs $8.99/month[33] and promises consumers access to cash advances.[34]

42.    Brigit's Premium membership costs $15.99/month and allows consumers access to cash advances and its credit building services.[35]

43.    Brigit promises consumers, among other things, that they will pay "no late fees" and "no interest" for cash advances and that Brigit can help users "[a]void overdrafts and worry less."[36]

44.    Brigit's Plus and Premium plans advertise the ability to "[c]ancel anytime."[37]

45.    However, Brigit automatically renews the membership for its Plus and Premium levels and charges consumers the membership fee each month until the consumer takes affirmative steps to cancel.

46.    The New York Autorenewal Law, N.Y. GEN. BUS. LAW §§ 527,

---

[32] Brigit does appear to allow some individuals to get advances without a subscription if they are willing to jump through additional hoops and email terms1@hellobrigit.com and state that they would like an advance without subscribing to a subscription. Brigit still requires them to be eligible.

[33] Upon information and belief, Brigit changed its subscription fee from $9.99 to $8.99 within the past two years.

[34] BRIGIT.COM, *supra* note 37.

[35] *Id.*

[36] *Id.*

[37] BRIGIT.COM, *supra* note 42.

14

527-a ("NYARL"), requires that an automatic renewal offer term contain a clear and conspicuous disclosure of "the description of the cancellation policy that applies to the offer." N.Y. GEN. BUS. LAW § 527-a(1)(a).

47. The location of Defendant's cancellation provision is deemphasized rather than made conspicuous, making it unlikely that reasonable consumers will even see it.

48. Brigit's automatic renewal offer is not in line with the NYARL because it fails to provide consumers with the required information regarding their ability to cancel their Brigit subscription.

49. Upon information and belief, Brigit had knowledge of the faults in its autorenewal policy, and the failures of its current automatic renewal offer did not result from a bona fide error.

50. Brigit knew or had reason to know that its autorenewal policy violates the NYARL.

51. Furthermore, consumers have consistently complained about their inability to cancel their Brigit monthly subscription on Brigit's Better Business Bureau page, including after the FTC settlement in November of 2024. For example, consumers have complained as follows:

> 8/21/24: I used hello Brigit beginning in 2021. And I attempted to cancel the subscription they have continuously charged me since Feb 2022 when I attempted to cancel the subscription after their false proposes and deceptive trade practices were exposed.

15

They continually charge my bank account month and month after I have repeatedly asked them to stop. And even reported and disputed with my bank. Their corrupt and fraudulent actions MUST be stopped . They continue to attempt to collect NOT owed money and refuse to cancel subscriptions after being asked to cease and desist. Their system is a complete scam and they know what they are doing. I am aware of FTC complaints and action against them for these same Bad Business/ Corrupt trade practices . I have indisputable evidence of that same CONTINUED behavior.[38]

7/17/25: It wont let me delete my account and cancel my subscription everytime it says switch to free plan i press that and it just redirects me back to the same screen saying i cant cancel unless i do the same step again. You are unable to contact anyone via phone all they have is a worthless chatbot.[39]

8/21/25: I wish I knew Brigit had to pay out $17 million dollars last year to consumers for deceptive practices. How are they still in business? They dont respond by email to ai chat support like they claim. There is no way to call or reach a human that I can find. They double charged a repayment, and theres no conceivable way of getting the second over-repayment cancelled/refunded, I just cancelled Brigit altogether and realized I was on the highest level plan which I had already downgraded. And they are still going to charge the fee for it in a week, in spite of cancellation. And they charged a 3.99 fee for an advance that was

---

[38] *Business Profile: Financial Technology: Brigit: Complaints page 7*, BETTER BUSINESS BUREAU (Dec. 24, 2025), https://www.bbb.org/us/ny/new-york/profile/financial-technology/brigit-0121-181186/complaints?page=7 [https://perma.cc/4XXD-R565].

[39] *Business Profile: Financial Technology: Brigit: Complaints page 3*, BETTER BUSINESS BUREAU (Dec. 24, 2025), https://www.bbb.org/us/ny/new-york/profile/financial-technology/brigit-0121-181186/complaints?page=3 [https://perma.cc/SL53-Y6ZY].

immediately cancelled, same minute as accepted. Its like they know that consumers using their product need it in a pinch therefore arent stopping to research - and they are capitalizing on that. Very shady - likely more well-deserved lawsuits incoming. Give another business your money if you must. NOT Brigit.[40]

9/26/25: I originally signed up for this because I need an extra money. After I utilize the service and no longer needed it I proceeded to cancel it back in July. I got a confirmation that it was canceledbut here I am and Im still being charged a membership fee 1499. I reached out to customer support via email on multiple occasions and have to hear anything back And Im still being charged and after counseling again I get a email saying that I will be charged again for a membership in October October 23 to be exact when indeed I shouldnt be getting charged anything since July and theyve been paid back considering this is a Short term lender.[41]

10/09/2025: Brigit has been repeatedly taking money from my account unauthorized, I attempted to contact them to no avail, sent in numerous emails with no response. There is no phone number associated with Brigit. This is beyond unacceptable. Im on an extremely tight budget and im being robbed for what little I do have from these people.[42]

---

[40] *Id.*

[41] *Business Profile: Financial Technology: Brigit: Complaints page 2*, BETTER BUSINESS BUREAU (Dec. 24, 2025), https://www.bbb.org/us/ny/new-york/profile/financial-technology/brigit-0121-181186/complaints?page=2 [https://perma.cc/3STK-G7J5].

[42] *Id.*

## PLAINTIFF'S ALLEGATIONS

52.   Plaintiff was previously a resident of Sugar Hill, Georgia, in Gwinnett County. In or around September 2025, Plaintiff moved to South Carolina, and she is now a resident of Conway, South Carolina, in Horry County.

53.   While Plaintiff was living in Georgia, she maintained an account at Georgia United Credit Union, which is based in Duluth, Georgia, in Gwinnett County.

54.   During the period from January 11, 2022, to the present, while Plaintiff was residing in Sugar Hill, Georgia, Plaintiff's Georgia United Credit Union account was charged by Brigit on occasions including the following:

        a.    On or about December 3, 2024, Plaintiff was charged $8.99 by Brigit.

        b.    On or about December 3, 2024, Plaintiff was charged $117.99 by Brigit. While Plaintiff's credit union appears to have declined the $117.99 charge, the $117.99 charge caused Plaintiff to be charged an insufficient funds fee of $35.00 by her credit union. On December 5, 2024, the credit union appears to have reversed the insufficient funds fee charge of December 3, 2024, and credited Plaintiff's account with $35.00.

18

c.  On or about December 27, 2024, Plaintiff was charged $8.99 by Brigit. While Plaintiff's credit union appears to have declined the $8.99 charge, the $8.99 charge caused Plaintiff to be charged an insufficient funds fee of $35.00 by her credit union.

d.  On or about December 27, 2024, Plaintiff was charged $117.99 by Brigit. While Plaintiff's credit union appears to have declined the $117.99 charge, the $117.99 charge caused Plaintiff to be charged an insufficient funds fee of $35.00 by her credit union.

e.  On or about January 14, 2025, Plaintiff was charged $117.99 by Brigit. While Plaintiff's credit union appears to have declined the $117.99 charge, the $117.99 charge caused Plaintiff to be charged an insufficient funds fee of $35.00 by her credit union.

55.  Plaintiff was unaware of the foregoing charges until she reviewed her statement from Georgia United Credit Union.

56.  After reviewing her statement, in or around January 2025, Plaintiff called Georgia United Credit Union to ask what was going on, as she did not know why charges by Brigit were appearing on her statement.

57.  Before Plaintiff had a chance to have a follow-up call with Georgia

United Credit Union, Georgia United Credit Union shut down Plaintiff's account, causing her significant hardship.

## CLASS ALLEGATIONS

58. Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), Plaintiff brings this class action individually and on behalf of a nationwide Class that is tentatively defined as follows:

> **The Class.** All consumers in the United States who were charged fees or other charges by Defendant (including but not limited to automatic monthly Brigit membership fees), during the applicable statute of limitations period to the date of judgment. All employees of Defendant, the Court, and Plaintiff's counsel are excluded from the Class.

59. Pursuant to Rule 23(a) and (b)(3), Plaintiff brings this action individually and on behalf of a Georgia subclass that is tentatively defined as follows:

> **The Georgia Subclass.** All consumers who, while residing in Georgia, were charged fees or other charges by Defendant (including but not limited to automatic monthly Brigit membership fees), during the applicable statute of limitations period to the date of judgment. All employees of Defendant, the Court, and Plaintiff's counsel are excluded from the Georgia Subclass.

60. Plaintiff reserves the right to modify or amend the definition of the proposed Class and the proposed Georgia Subclass before or after the Court determines whether class certification is appropriate as discovery progresses.

61.  **Numerosity:** The Class is comprised of hundreds, if not thousands, of consumers throughout the United States, and the Georgia Subclass is comprised of hundreds, if not thousands, of consumers throughout Georgia. The Class and the Georgia Subclass are so numerous that joinder of all members of the Class and the Georgia Subclass is impracticable. The precise number of Class and Georgia Subclass members is unknown to Plaintiff, but the precise number and identity of Class and Georgia Subclass members should be easily identifiable through Defendant's records.

62.  **Commonality:** This action involves common questions of law and fact, which predominate over any questions affecting individual Class and Georgia Subclass members. These common legal and factual questions include, but are not limited to, the following:

  a.  Whether Defendant engaged in the common course of conduct described herein;

  b.  Whether Defendant's conduct violates the NYARL;

  c.  Whether Defendant's conduct violates the applicable New York or Georgia consumer protection statutes;

  d.  Whether Defendant's conduct violates the EFTA and its implementing regulations;

  e.  Whether Defendant's conduct violates the applicable New York or Georgia common law;

f.      Whether Defendant was unjustly enriched as a result of its conduct;

g.      Whether Class members and the Georgia Subclass members have been injured by Defendant's conduct;

h.      Whether and to what extent equitable relief should be granted; and

i.      The extent of class-wide injury and the measure of damages for those injuries.

63.     **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class and the Georgia Subclass because *inter alia*, all Class and Georgia Subclass members were injured through the uniform misconduct described above, and Plaintiff is advancing the same claims and legal theories on behalf of herself and all Class and Georgia Subclass members.

64.     **Adequacy of Representation:** Plaintiff will fairly and adequately protect the interests of the members of the Class and the Georgia Subclass. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class or the Georgia Subclass. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

65.     **Predominance:** Defendant has engaged in a common course of

conduct towards Plaintiff, the Class members, and the Georgia Subclass members, in that all claims by Plaintiff and the unnamed Class members and Georgia Subclass members are based on the common course of conduct by Defendant in improperly charging Plaintiff, the Class members, and the Georgia Subclass members.

66. The questions of law or fact common to Plaintiff's claims and the claims of the members of the Class and the Georgia Subclass predominate over any questions of law or fact affecting only individual members of the Class or the Georgia Subclass. Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

67. Because the liability issue is common to the Class and to the Georgia Subclass, common questions predominate over individual questions.

68. **Superiority:** A class action is superior to individual actions in part because of non-exhaustive factors listed below:

a. Joinder of all Class and Georgia Subclass members would create extreme hardship and inconvenience;

b. Individual claims by Class members or Georgia Subclass members are impractical because the costs to pursue individual claims exceed the value of what any one Class member or Georgia Subclass member has at stake, and as a

23

result, individual Class members and Georgia Subclass members have no interest in prosecuting and controlling separate actions;

c. There are no known individual Class or Georgia Subclass members who are interested in individually controlling the prosecution of separate actions;

d. The interests of justice will be well served by resolving the common disputes of Class members and Georgia Subclass members in one forum;

e. Individual suits would not be cost-effective or economically maintainable as individual actions; and

f. The action is manageable as a class action.

69. **Notice:** Plaintiff and her counsel anticipate that notice to the proposed Class and/or Georgia Subclass will be effectuated through recognized, Court-approved notice dissemination methods, which may include United States mail, electronic mail, Internet postings, and/or published notice.

## CLAIMS FOR RELIEF

### COUNT I
### CONVERSION UNDER NEW YORK LAW
### By Plaintiff on Behalf of Herself and the Class

70. Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

24

71.    Plaintiff brings this claim for conversion under New York law against Defendant individually and on behalf of the Class members.

72.    Under New York law, conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property.

73.    As a result of the charges made by Defendant to Plaintiff's and the Class members' bank or credit union accounts without their knowledge or authorization, Defendant has taken money that belongs to Plaintiff and the Class members.

74.    Plaintiff and the Class members owned and had a possessory right to the funds that were taken by Defendant. Defendant did not own the funds and did not have a possessory right to them.

75.    Defendant's wrongful act of charging Plaintiff and the Class members without their authorization interfered with Plaintiff's and the Class members' interests in their funds.

76.    Defendant came into possession of Plaintiff's and the Class members' money unlawfully. Accordingly, demand for return of the money and refusal by Defendant to return it are not required.

77.    The amount of money wrongfully taken by Defendant is capable of identification.

78.    Defendant charged Plaintiff and the Class members as described herein knowingly, willfully, and with oppression, fraud, and/or malice.

79.    As a result of Defendant's actions, Plaintiff and the Class members have suffered damages.

## COUNT II
## DECEPTIVE ACTS AND PRACTICES
### N.Y. GEN. BUS. LAW § 349
**By Plaintiff on Behalf of Herself and the Class**

80.    Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

81.    Plaintiff brings this claim for violation of New York GBL section 349 against Defendant individually and on behalf of the Class members.

82.    Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. N.Y. GEN. BUS. LAW § 349(a).

83.    As detailed more fully above, Brigit engaged in deceptive and unfair acts and practices by charging Plaintiff and the Class members without their knowledge or permission, including but not limited to automatic monthly subscription renewal and other charges.

84.    Defendant charged Plaintiff's and the Class members' bank and credit union accounts without their knowledge or permission (including but not limited to automatic monthly subscription renewal and other charges) from its

26

headquarters in New York, and otherwise ran its business operations from New York.

85.    Additionally, Defendant has violated GBL section 349 by engaging in deceptive conduct that violates the NYARL. Under the NYARL, it is "unlawful for any business making an automatic renewal or continuous service offer to a consumer in this state" to "fail to present to the consumer, in a clear and conspicuous manner, the material terms of any automatic renewal offer or continuous service offer." N.Y. GEN. BUS. LAW § 527-a(1)(a). Defendant has violated the NYARL for reasons including at least that Defendant did not clearly and conspicuously present to consumers the cancellation mechanisms required to cancel their subscriptions.

86.    The aforementioned acts are deceptive and unfair and contrary to the public policy of New York, which aims to protect consumers. Further, these acts misled Plaintiff and the Class members and would be likely to mislead a reasonable consumer acting reasonably under the circumstances.

87.    Plaintiff and the Class members were actually harmed by the above-described acts as they were deprived of money when Defendant withdrew from their bank or credit union accounts.

88.    Defendant's foregoing deceptive and unfair acts and practices were directed at consumers including Plaintiff and the Class members.

89.    Brigit's violations of section 349 described herein were willful or

27

knowing.

90. As a consequence of Brigit's foregoing deceptive and unfair acts and practices, Plaintiff and the Class members lost money and were injured and damaged. By reason of the foregoing, Plaintiff and the Class members seek actual damages or statutory damages of $50 per violation, whichever is greater; an increased award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, on account of Brigit's willful or knowing violation of section 349; and reasonable attorneys' fees and costs. N.Y. GEN. BUS. LAW § 349(h).

91. By reason of the foregoing, Plaintiff and the Class members also seek declaratory and equitable relief, all recoverable interest, and such other and further relief as the Court deems just and proper.

**<u>COUNT III</u>**
**VIOLATION OF THE ELECTRONIC FUNDS TRANSFER ACT**
**15 U.S.C. § 1693 *et seq.***
**By Plaintiff on Behalf of Herself and the Class**

92. Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

93. Plaintiff brings this claim for violation of the EFTA and its implementing regulations against Defendant individually and on behalf of the Class members. The EFTA's implementing regulations are known as "Regulation E" and are codified at 12 C.F.R. § 1005 *et seq.*

94. The EFTA "provide[s] a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693(b). The "primary objective" of the EFTA "is the provision of individual consumer rights." *Id.*

95. Any waiver of EFTA rights is void. "No writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by [the EFTA]." 15 U.S.C. § 1693*l*.

96. Under the EFTA, the term "account" means "a demand deposit, savings deposit, or other asset account (other than an occasional or incidental credit balance in an open end credit plan as defined in [15 U.S.C. § 1602(i)]), as described in regulations of the Bureau [of Consumer Financial Protection], established primarily for personal, family, or household purposes, but such term does not include an account held by a financial institution pursuant to a bona fide trust agreement." 15 U.S.C. § 1693a(2).

97. Plaintiff and each of the Class members maintained an "account" as that term is defined by 15 U.S.C. § 1693a(2).

98. Under the EFTA, the term "consumer" means "a natural person." 15 U.S.C. § 1693a(6).

99. Plaintiff and the Class members are each a "consumer" within the meaning of 15 U.S.C. § 1693a(6).

100. Under the EFTA, the term "electronic fund transfer" means "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7). Under Regulation E, the term "electronic fund transfer" includes "[t]ransfers resulting from debit card transactions, whether or not initiated through an electronic terminal." 12 C.F.R. § 1005.3(b)(1)(v).

101. Defendant's transfers of money from the financial accounts of Plaintiff and the Class members, as alleged herein, are "electronic fund transfers" within the meaning of the EFTA and its implementing regulations.

102. Under the EFTA, the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(10); *accord* 12 C.F.R. § 1005.2(k). The Official Interpretation of Regulation E states that "[a] preauthorized electronic fund transfer under Regulation E is one authorized by the consumer in advance of a transfer that will take place on a recurring basis, at substantially regular intervals, and will require no further action by the consumer to initiate the transfer." 12 C.F.R. Pt. 1005, Supp. I, § 1005.2(k), cmt. 1 (Oct. 1, 2025).

103. Under the EFTA, "[a] preauthorized electronic fund transfer from

a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693e(a). Similarly, under Regulation E, "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer," and "[t]he person that obtains the authorization shall provide a copy to the consumer." 12 C.F.R. § 1005.10(b).

104.  The Official Interpretation of Regulation E explains that "[t]he account-holding financial institution does not violate the regulation when a third-party payee fails to obtain the authorization in writing or fails to give a copy to the consumer; rather, it is the third-party payee that is in violation of the regulation." 12 C.F.R. Pt. 1005, Supp. I, § 1005.10(b), cmt. 2.

105.  Defendant uniformly and routinely initiated preauthorized electronic fund transfers and charged the bank and credit union accounts of Plaintiff and the Class members without obtaining their written authorization for the transfers, in violation of the EFTA and Regulation E. As discussed above, Defendant charged Plaintiff's and the Class members' bank and credit union accounts without their knowledge and without written authorization.

106.  As a direct and proximate result of Defendant's violations of the EFTA and Regulation E, Plaintiff and the Class members have suffered damages in the amount of the unauthorized charges by Defendant.

31

107.   Under the EFTA:

Except as otherwise provided by [15 U.S.C. § 1693m] and [15 U.S.C. § 1693h], any person who fails to comply with any provision of [the EFTA] with respect to any consumer, except for an error resolved in accordance with [15 U.S.C. § 1693f], is liable to such consumer in an amount equal to the sum of--

(1) any actual damage sustained by such consumer as a result of such failure;

(2)(A) in the case of an individual action, an amount not less than $100 nor greater than $1,000; or

(B) in the case of a class action, such amount as the court may allow, except that (i) as to each member of the class no minimum recovery shall be applicable, and (ii) the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same person shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the defendant; and

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court.

15 U.S.C. § 1693m(a).

108.   On account of Defendant's violations of the EFTA and Regulation E, Plaintiff and the Class members seek to recover all damages authorized under the EFTA, including statutory damages in the amount of "the lesser of $500,000 or 1 per centum of the net worth of the defendant." 15 U.S.C. § 1693m(a)(2)(B).

32

109.   Pursuant to 15 U.S.C. § 1693m(a)(3), Plaintiff and the Class members also seek to recover costs of suit and reasonable attorneys' fees from Defendant.

## COUNT IV
## UNJUST ENRICHMENT UNDER NEW YORK LAW
### By Plaintiff on Behalf of Herself and the Class

110.   Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

111.   Plaintiff brings this claim for unjust enrichment under New York law against Defendant individually and on behalf of the Class members.

112.   As discussed above, Brigit charged Plaintiff and the Class members without their knowledge or permission. Defendant was thereby enriched at the expense of Plaintiff and the Class members.

113.   It would be inequitable, unjust, and unconscionable for Defendant to retain the money it took from Plaintiff and the Class members without their knowledge or permission.

114.   Plaintiff and the Class members seek disgorgement of all funds obtained by Defendant from them without their knowledge or permission, as well as all other appropriate relief permitted by law of unjust enrichment, including reasonable attorneys' fees and costs.

## COUNT V
## CONVERSION UNDER GEORGIA LAW
**By Plaintiff on Behalf of Herself and the Georgia Subclass**
**In the Alternative to Count I**

115.  Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

116.  Plaintiff brings this claim for conversion under Georgia law against Defendant individually and on behalf of the Georgia Subclass members, in the alternative to Count I above.

117.  Under Georgia law, to state a claim for conversion, a plaintiff must normally allege: (1) title to the property or the right of possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property. However, demand and refusal are not required where the defendant comes into possession of the property unlawfully.

118.  As a result of the charges made by Defendant to Plaintiff's and the Georgia Subclass members' bank or credit union accounts without their knowledge or authorization, Defendant has taken money that belongs to Plaintiff and the Georgia Subclass members.

119.  Plaintiff and the Georgia Subclass members owned and had a possessory right to the funds that were taken by Defendant. Defendant did not own the funds and did not have a possessory right to them.

34

120. Defendant's wrongful act of charging Plaintiff and the Georgia Subclass members without their authorization interfered with Plaintiff's and the Georgia Subclass members' interests in their funds.

121. Defendant came into possession of Plaintiff's and the Georgia Subclass members' money unlawfully. Accordingly, demand for return of the money and refusal by Defendant to return it are not required under Georgia law.

122. The amount of money wrongfully taken by Defendant is capable of identification.

123. Defendant charged Plaintiff and the Georgia Subclass members as described herein knowingly, willfully, and with oppression, fraud, and/or malice.

124. As a result of Defendant's actions, Plaintiff and the Georgia Subclass members have suffered damages.

**<u>COUNT VI</u>**
**VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT OF 1975**
**GA. CODE § 10-1-390 *et seq.***
**By Plaintiff on Behalf of Herself and the Georgia Subclass**
**In the Alternative to Count II**

125. Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

126. Plaintiff brings this claim for violation of the GFBPA against

Defendant individually and on behalf of the Georgia Subclass, in the alternative to Count II above.

127. In a section titled "Legislative intent; interpretation," the GFBPA provides:

> (a) The purpose of this part shall be to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce in part or wholly in the state. It is the intent of the General Assembly that such practices be swiftly stopped, and this part shall be liberally construed and applied to promote its underlying purposes and policies.
>
> (b) It is the intent of the General Assembly that this part be interpreted and construed consistently with interpretations given by the Federal Trade Commission in the federal courts pursuant to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. Section 45(a)(1)), as from time to time amended.

GA. CODE § 10-1-391.

128. Under the GFBPA, "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful." GA. CODE § 10-1-393(a).

129. Under the GFBPA, "consumer transactions" means "the sale, purchase, lease, or rental of goods, services, or property, real or personal, primarily for personal, family, or household purposes." GA. CODE § 10-1-392(a)(10).

36

130. Under the GFBPA, "consumer acts or practices" means "acts or practices intended to encourage consumer transactions." GA. CODE § 10-1-392(a)(7).

131. Under the GFBPA, "trade" and "commerce" mean "the advertising, distribution, sale, lease, or offering for distribution, sale, or lease of any goods, services, or any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value wherever situate and shall include any trade or commerce directly or indirectly affecting the people of this state." GA. CODE § 10-1-392(a)(28).

132. Defendant's conduct described above constitutes unfair or deceptive acts or practices in the conduct of consumer transactions in trade or commerce and thereby violates Georgia Code section 10-1-393(a).

133. Defendant charged subscription fees and other charges associated with Defendant's services (which services are for personal, family, or household purposes) to Plaintiff and the Georgia Subclass members without their knowledge or authorization.

134. Because Defendant charged Plaintiff and the Subclass members without their knowledge or authorization, Plaintiff and the members of the Georgia Subclass suffered injury and economic damages.

135. An "intentional violation" of the GFBPA "occurs when the person committing the act or practice knew that his or her conduct was in violation of

37

[the GFBPA]." GA. CODE § 10-1-392(b).

136.   Defendant has committed "intentional violations" of the GFBPA.

137.   Pursuant to section 10-1-399 of the GFBPA, Plaintiff and the Georgia Subclass members seek actual damages; exemplary damages; reasonable attorneys' fees and expenses; pre-judgment interest; and any other relief that the Court deems necessary and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class respectfully ask this Court to award judgment against Defendant and to enter an order:

1.   certifying the Class as defined above, appointing Plaintiff as the Class representative, and designating Reese LLP and Lee Segui, PLLC, as Class counsel;

2.   finding that Defendant has committed the violations of law alleged herein;

3.   determining that Defendant has been unjustly enriched as a result of its wrongful conduct and awarding restitution and monetary damages to the Class;

4.   awarding actual damages, the exact amount of which is to be determined at trial;

5.   awarding treble damages, the exact amount of which is to be determined at trial;

38

6.    awarding interest, costs, and reasonable attorneys' fees and expenses; and

7.    granting all other such relief as the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.


Respectfully submitted,

Date: January 13, 2026             **LEE SEGUI, PLLC**

                        By:  _/s/ Harper T. Segui_
                            Harper T. Segui
                            Georgia Bar No. 096540
                            825 Lowcountry Boulevard, Suite 101
                            Mount Pleasant, South Carolina 29464
                            Telephone: 843-790-6520
                            hsegui@leesegui.com

                            **LEE SEGUI, PLLC**
                            Erin J. Ruben*
                            Thomas Pacheco*
                            Kathryn Anne B. Robinson*
                            900 W. Morgan Street
                            Raleigh, NC 27603
                            eruben@leesegui.com
                            tpacheco@leesegui.com
                            krobinson@leesegui.com

                            **REESE LLP**
                            Michael R. Reese*
                            100 West 93rd Street
                            Sixteenth Floor
                            New York, New York 10025
                            Telephone: 212-643-0500
                            Facsimile: 212-253-4272


39

mreese@reesellp.com

*to be admitted *pro hac vice*

*Attorneys for Plaintiff and the Proposed Class*

40